UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEAN SOLOMON, Individually and on Behalf of All Others Similarly Situated, | : |
| Plaintiff | : |
| | : Civil Action No.: |
| vs. | : |
| | : CLASS ACTION COMPLAINT |
| THE HERSHEY COMPANY, MARS, INC., NESTLE U.S.A., INC., NESTLE S.A., AND CADBURY SCHWEPPES PLC, | : Jury Trial Demanded |
| Defendants. | : |

Plaintiff Dean Solomon, individually and on behalf of all others similarly situated, brings

this action against the Defendants named in this Complaint for treble damages and injunctive

relief under the antitrust laws of the United States. Plaintiff demands a trial by jury, and alleges

information and belief, based upon, *inter alia*, the investigation of counsel, which includes a

review of public announcements made by The Hershey Company and Nestle S.A., regulatory

filings made by various primary confectionery manufacturers, press releases, media reports

relating to the confectionery industry, and citation to the sworn testimony of Daniel Wilcock, an

attorney working with the Canadian Competition Bureau from *Commission of Competition and

Hershey Canada, Inc., et al.*, Case No. 12560 (Nov. 19, 2007) matter, and allege the following:

## NATURE OF THE CASE

1.    This lawsuit is brought as a class action on behalf of all persons or entities who

purchased chocolate directly from Defendants or their co-conspirators, predecessors, or

controlled subsidiaries from at least January 1, 2003 through the present (the "Class Period").

During all or part of the Class Period, Defendants and their co-conspirators manufactured or sold

chocolate and entered into and implemented a continuing combination and conspiracy to fix,

raise, maintain or stabilize prices for chocolate sold in the United States. As a direct and proximate result thereof, Plaintiff and the members of the class have paid artificially inflated prices for chocolate and suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

2.     Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 6a, 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for injuries sustained by Plaintiff and the Class members as a result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in this Complaint.

3.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

4.     Venue is proper in this Judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, the Plaintiff and Defendants resided, transacted business, were found, or had agents in this District, and it appears food distributors of the ITWAL trade association of food wholesalers may have sold chocolate within this District.

5.     This Court has in *personam* jurisdiction over each of the Defendants because, *inter alia*, each Defendant (a) transacted business throughout the United States, including this District, (b) manufactured, sold, shipped, and delivered substantial quantities of chocolate throughout the United States, (c) had substantial contacts with the United States, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States.

## PLAINTIFF

6.    Plaintiff Dean Solomon is a New York resident.  During the Class Period, Plaintiff Solomon purchased chocolate directly from one or more of the Defendants and was injured by reason of the antitrust violations alleged herein.

## DEFENDANTS

7.    The Hershey Company ("Hershey") is a Delaware corporation located in Hershey, Pennsylvania.  Hershey also has corporate and branded retail locations in Oakdale and Redlands, California and New York, New York.  Hershey sells chocolate products, such as Cacao Reserve, Scharffen Berger, Joseph Schmidt, Dagoba, Hershey's chocolate bars, Almond Joy, and Reese's. Hershey has a licensing agreement with Cadbury Schwepps P.L.C. and Nestle Suisse S.A. to market certain chocolate candy products in Michigan and United States. Hershey has sales representatives in Ann Arbor, Michigan. During the class period, Hershey manufactured and sold the relevant chocolate candy throughout North American markets.

8.    Mars Incorporated ("Mars") is a Delaware corporation with corporate offices in Illinois, New Jersey, and Virginia. Mars has three business segments: food, snack, and pet care. Masterfoods was a fully owned subsidiary of Mars and during 2007 all Masterfoods business units adopted the Mars brand.  Mars sells chocolate products, such as Milky Way, M&Ms, Snickers, Dove, Mars, and Ethel's Chocolate.  Mars operates M&M's World, a branded retail store in Las Vegas, Nevada, Orlando, Florida, and New York, New York.  In addition to M&M's World, Mars also operates Ethel's Chocolate Lounges in Illinois and Nevada.  During the class period, Mars manufactured and sold the relevant chocolate candy throughout North American markets.

9.    Defendant Nestle, U.S.A., Inc. ("Nestle U.S.A."), is a Connecticut Corporation with corporate offices in Glendale, California.  It is a wholly owned subsidiary of Defendant

Nestle S.A. At all relevant times, Nestle U.S.A. manufactured, marketed, sold and/or distributed chocolate in the United States.

10.     Defendant Nestle S.A. ("Nestle S.A."), is the world's largest food and beverage company and makes its headquarters in Vevey, Switzerland.  At all relevant times, Nestle manufactured, marketed, sold, and/or distributed chocolate in the United States.

11.     Defendant Cadbury Schweppes P.L.C. ("Cadbury") is a confectionery and beverage company with its headquarters in Berkeley Square, London, England, UK. Cadbury is the largest international chocolate brand.  At all relevant times, Cadbury licensed, manufactured, marketed, sold, and/or distributed chocolate in the United States.

## DEFENDANTS' AGENTS AND CO-CONSPIRATORS

12.     Wherever in this complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they have actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

13.     The acts alleged in this Complaint to have been done by the Defendants were authorized, ordered and condoned by their parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

## INTERSTATE TRADE AND COMMERCE

14.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

4

15.    During the Class Period, Defendants sold and shipped substantial quantities of chocolate in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which Defendants produced chocolate.

## CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action on his own behalf and as a class action under the provisions of Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedures on behalf of all members of the following Class:

> All persons or entities (excluding Defendants, their parents, predecessors, subsidiaries, affiliates, and co-conspirators and government entities) who purchased chocolate directly from the Defendants or their co-conspirators (including all members of ITWAL) or any predecessor, subsidiary, or affiliate of any Defendant, in the United States at any time during the period from at least January 1, 2003 to the present.

17.    Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants or their co-conspirators. Because of the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all class members is impracticable.

18.    Plaintiff is a member of the Class. Plaintiff claims are typical of the claims of the Class members and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a direct purchaser of chocolate and his interests are coincident with and not antagonistic to those of the other members of the Class.

19.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

20.    There are questions of law or fact common to the class, including:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of chocolate sold in the United States and/or to allocate markets and customers for the sale or chocolate in the United States;

b.    The identity of the participants in Defendants' conspiracy;

c.    The duration of Defendants' conspiracy and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether Defendants' alleged conspiracy violated Section 1 of the Sherman Act;

e.    Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and the other members of the Class;

f.    The effect of Defendants' conspiracy on the prices of chocolate sold in the United States during the Class Period;

g.    The appropriate measure of damages sustained by Plaintiff and other members of the Class; and

h.    Whether Plaintiff and the Class are entitled to injunctive relief.

21.    The questions of law and/or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages. The question of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

22.     Defendants and their co-conspirators have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

23.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims of many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties in management that would preclude maintenance as a class action.

24.     Finally, the Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## THE CHOCOLATE PRICE FIXING SCHEME AND INTERNATIONAL INVESTIGATIONS IN NORTH AMERICA

25.     "Chocolate" comprises a number of raw and processed foods that are produced from the seed of the tropical cacao tree.  The seeds of the cacao tree have an intense bitter taste, and must be fermented to develop the flavor.  Cocoa beans are cleaned, roasted, and graded. Bean shells are removed to extract the nib which are ground releasing and melting the cocoa butter in order to produce chocolate liquor.

26.     The United States Department of Justice has commenced an investigation into the pricing practices in the chocolate confectionary industry, according to a statement by Defendant Mars on December 20, 2007.  On the same date, Defendant Nestle U.S.A. also issued a statement acknowledging the existence of an inquiry into U.S. chocolate marketing practices.

27.    The U.S. investigation follows a disclosure by the Canadian Competition Bureau that it is investigating allegations that certain Defendants fixed prices of chocolate products.

28.    According to Court documents unsealed in December 2007 in Canada, high level executives of Defendants Hershey, Mars and Nestle S.A. or their Canadian divisions, and other companies met surreptitiously at coffee shops, restaurants and conventions to allegedly fix the prices paid for chocolate in Canada since February 2002.

29.    The Canadian Competition Bureau alleges that representatives of Hershey, Mars and Nestle S.A., or their affiliates, met to deliberately fix prices in Canada in violation of Canadian law.  The Canadian Competition Bureau has mobilized some 30 investigators in the probe and issued search warrants and seized thousands of corporate documents, emails, correspondence and computer files from Hershey, Mars and Nestle S.A., or their affiliates.  The Ontario Superior Court of Justice granted the search warrants, "based on evidence that there are reasonable grounds to believe that a number of suppliers in the chocolate confectionary industry have engaged in activities contrary to the conspiracy provisions of the Competition Act."

30.    The Canadian Competition Bureau alleges that the chief executive of Nestle Canada handed sensitive pricing secrets to a competitor to facilitate price-fixing.  Specifically, documents allege the chief executive of Nestle Canada handed envelopes stuffed with pricing information to a competitor, instructing the person not to be seen picking up the material in his office.

31.    The Canadian Competition Bureau alleged the collusion started in February, 2002, and was initially coordinated by a food distribution wholesaler association, known as ITWAL.  According to the court documents, ITWAL worked with the chocolate companies to force retailers to stop cutting prices for chocolate bars and reduce trade spend programs.  The

court documents also outlined several meetings involving senior executives of the chocolate companies. "I want you to hear it from the top -- I take my pricing seriously," Robert Leonidas, Nestle's CEO, allegedly told a competitor during one meeting before handing him an envelope containing pricing information.

32.    According to an article in *The Wall Street Journal* on December 22, 2007,

People from one company, not identified in the court documents, supplied a lawyer at Canada's Competition Bureau with emails and information about telephone calls and private meetings involving Hershey, Mars, Nestle and ITWAL Ltd., a Canadian candy distributor, according to separate 57-page and 24 page affidavits filed by the Competition Bureau with the court. These witnesses, also not identified in documents, have applied for immunity from prosecution.

The Competition Bureau filed the affidavits in support of a request for a warrant to search Canadian offices of Hershey, Mars, Nestle and ITWAL. Cadbury Schweppes PLC of London, Canada's largest chocolate maker as of 2005, isn't named in the request.

Canadian authorities started investigating the chocolate companies in recent months but haven't filed any charges. Competition Bureau officials couldn't be reached for comment on Friday. Daniel Wilcock, a lawyer at the agency, wrote in the affidavit, "The price-fixing communications were often at the most senior levels of the companies involved, and they have continued over a number of years.

Spokesmen for Nestle and Mars didn't respond to requests for comment. Spokesmen at Hershey and ITWAL declined to comment.

According to the affidavits, one unidentified witness gave investigators a lengthy account involving Nestle Canada Chief Executive Robert Leonidas. The witness claimed he was approached by Mr. Leonidas during the Confectionery Manufacturers Association of Canada annual meeting in June 2005. This person said Mr. Leonidas "said words to the effect of 'We are going to take a price increase and I want you to hear it from the top." According to the affidavit, Mr. Leonidas then handed the person an envelope.

The witness told authorities that Mr. Leonidas "would have left the meeting with the idea that the [witness's company] would follow a price increase led by Nestle," the affidavit says.

The witness opened the envelope sometime after meeting with Mr. Leonidas, the affidavit says. Asked by a Competition Bureau lawyer why he didn't open the envelope immediately, the witness said, "Because you shouldn't talk about

pricing. I didn't want to be rude to Bob, so I said OK, was neutral, but I didn't want him to think, in any way, that I was coordinating with him." The witness said the envelope contained a document about Nestle's planned price increase on chocolate in 2005.

On July 6, 2005, the witness told his assistant to go to Mr. Leonidas's office to pick up something, the account continues. The assistant went to an unspecified Nestle office in Canada and was met by Mr. Leonidas downstairs. "He said something to the effect that it was better not to be seen in his office and handed [the assistant] an envelope," the affidavit says. This envelope also contained information about a planned price increase by Nestle.

The company that came forward to Canadian authorities announced an average price increase of 5.2% for its chocolates effective Oct. 31, 2005, the affidavit says. "The price increase ... was such as to align its prices on a number of common formats with those of Nestle," the affidavit says. Hershey and Mars quickly followed suit, the affidavit says.

Discussions over price-fixing continued, according to the affidavits. Last July, a different witness for the company met Sandra Martinez de Arevalo, president of Nestle Canada's confectionery business, for lunch at Auberge du Pommier, a restaurant in Toronto, the affidavit says. According to the witness's account, Ms. Martinez suggested that the witness's company "lead a price increase in 2007, as Nestle wanted to take a price increase in the third quarter." The witness said he answered that his company wasn't prepared to take a price increase in 2007, but might in 2008.

Another witness said he was approached on Sept. 27 by Eric Lent, General Manager of Hershey Canada, at a trade association meeting. As he was getting ready to sit at the dinner table, this witness said, Mr. Lent approached him and said Nestle was "taking a price increase" and "so we should take advantage" or "we should increase our prices too," according to the affidavit. According to the court document, Mr. Lent continued: "Bob [Leonidas] and I talk about it all the time. It's public knowledge that Nestle is taking its prices up."

33.    The documents say that other meetings took place at a coffee shop in Toronto in 2006, Toronto's Auberge du Pommier restaurant in July, 2007, and at food conventions in Vancouver and Niagara-on-the-Lake, Ontario, in 2007.  When one participant balked at the discussions, Eric Lent, Hershey Canada's general manager allegedly replied; "Don't worry, we can talk about it. Bob [Leonidas] and I talk all the time."

10

34.    According to news reports, accusations similar to those made in Canada have been made in the U.S.

35.    The United States chocolate market is highly concentrated with just a handful of major producers manufacturing the chocolate used in the United States and worldwide. The chocolate market has undergone consolidation through acquisitions and joint ventures. Hershey, Mars and Nestle are referred to as the "big three" in the U.S. chocolate market, although Cadbury is also a significant factor. At certain times during the Class Period, Hershey held a market share of approximately 32.6% of the U.S. market and Mars held a market share of approximately 29.6% of the U.S. market.

36.    According to a 2004 market analysis, larger chocolate producers were able to construct barriers to entry to thwart competition from middle-tier chocolate producers. In 2002, many chocolate manufacturers had excess capacity. During the class period, Hershey announced the closure of a number of North American chocolate manufacturing facilities, including in the United States, Ontario, Quebec and Nova Scotia. On information and belief, closure of those facilities will have the effect of restricting the supply of chocolate in the North American market.

37.    Defendant Cadbury announced in 2007 that it would increase prices of chocolate bars more than the previous projected price increase of four to six percent and more than the rate of inflation. Cadbury stated the price increase was intended to offset increases in the costs of such raw materials as dairy, oil and cocoa. A Nestle spokesman also stated in 2007 that surging global commodity costs, including the cost of milk, was responsible for price increases needed to maintain profit margins. In 2007, Hershey increased the prices of chocolate bars and Reese's cups four to five percent.

11

## COUNT I

## <u>VIOLATIONS OF THE SHERMAN ACT</u>

38.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

39.    During the Class Period, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to implement, artificially raise, fix, maintain, and/or stabilize the prices of chocolate products, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

40.    In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the prices of chocolate products.

41.    During the Class Period, Plaintiff and members of the Class purchased chocolate products directly from Defendants and their co-conspirators (or their respective agents, predecessors, subsidiaries, affiliates, and/or business partners).

42.    The illegal combination and conspiracy alleged herein had the following effects, among others:

    a.    price competition in the pricing of chocolate products, and, consequently, the prices of which, has been restrained, suppressed, and/or eliminated;

    b.    prices charged by Defendants for chocolate products were fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels;

c.    prices paid by Plaintiff and members of the Class for chocolate products charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

d.    Defendants refused to engage in price competition for chocolate products.

43.    Defendants' anticompetitive activities and their effects are in violation of the Sherman Act.

44.    During the Class Period, Defendants sold chocolate products in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such products across state boundaries. Defendants' activities, and the sale of their products, have both taken place within, and have had a substantial anticompetitive effect upon, interstate commerce within the United States.

45.    Plaintiff and members of the Class seek injunctive relief, and treble damages, and any such other relief that the Court deems necessary and appropriate.

46.    Plaintiff and members of the Class have been required to pay more for chocolate products in the United States than they would have paid in a competitive marketplace absent Defendants' price-fixing cartel.

47.    During the Class Period, Defendants' chocolate price-fixing conspiracy as described herein caused Plaintiff and the members of the Class to pay artificially inflated prices for chocolate products that they would not have paid absent such violations. As a result, Plaintiff and the members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

48.    As a direct and proximate result of Defendants' illegal conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective

businesses and property, in that they have paid artificially inflated prices during the Class Period that they would not have paid in the absence of the illegal conspiracy.

## FRAUDULENT CONCEALMENT

49. Throughout the relevant period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct against Plaintiff and the Class.

50. Plaintiff and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced. Nor could Plaintiff and the members of the Class have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereon and fraudulently concealed their activities through various other means and methods designed to avoid detection.

51. Plaintiff and the members of the Class could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' and their coconspirators' active and purposeful concealment of their unlawful activities.

52. Defendants and their co-conspirators engaged in a successful, illegal price-fixing conspiracy with respect to chocolate, which they affirmatively concealed, and which by its nature was inherently self concealing, in at least the following respects:

      a.     By meeting secretly to discuss the prices of chocolate sold in North American markets;

      b.     By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature of substance of the acts and communications in furtherance of their illegal scheme; and

14

c.      By giving false and pretextual reasons for the pricing of chocolate sold by them during the Class Period, including increases in the cost of ingredients of chocolate, and by falsely describing such pricing as being the result of competitive factors rather than collusion.

53.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

## EFFECTS

54.    Defendants' combination and conspiracy alleged in this Complaint has had the following effects, among others:

a.      Price competition in the sale of chocolate has been restrained, suppressed and eliminated throughout the United States;

b.      Prices for chocolate sold by Defendants and the co-conspirators have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.      Purchasers of chocolate from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

55.    As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators as alleged in this Complaint, Defendants have restrained competition in the sale of chocolate, and the Plaintiff and other members of the Class have been injured in their business and property in that they paid more for chocolate than they otherwise would have paid in the absence a unlawful conduct of Defendants and their co-conspirators.

56.    Defendants have also been unjustly enriched as a result of their unlawful conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class proposed in this Complaint, respectfully requests:

A.     That the Court certify the Class pursuant to Fed. R. Civ. P. 23;

B.     That Defendants' unlawful combination and conspiracy as alleged in this Complaint be adjudicated and decreed a per se violation of the Sherman Act, 15 U.S.C. § 1;

C.     That Plaintiff and the Class recover damages against Defendants and their coconspirators, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.     That Plaintiff and the Class be awarded their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

E.     That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.     That this Court permanently enjoin all continuing and future unlawful activity by Defendants in violation of the antitrust laws; and

G.     That Plaintiff be awarded such additional relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated: January 28, 2008

MILBERG WEISS LLP

Peter Safirstein, Esq.
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Tel:    (212) 594-5300
Fax:    (212) 868-1229
psafirstein@milbergweiss.com

*Counsel for Plaintiff*